## THE DERBY TURNPIKE COMPANY *against* PARKS.

A turnpike company, incorporated in 1798, was authorized to make a road from *N* to *D,* and to take these among other tolls, *viz.* on every pleasure four wheeled carriage, 25 cents; on every mail stage, 6 cents, 2 mills; on every other stage, 25 cents. In 1828, *P* made a contract with the post-master-general to transport the mail of the *United States* from *N* to *D* and back, three times a week; and in pursuance of such contract, has ever since carried the mail, in a stage coach, on said road, it being the most convenient route from *N* to *D.* In *May*, 1829, the turnpike company made application to the General Assembly, without notice to *P,* for liberty to collect the same toll on mail carriages as on other carriages of the same description, stating the tolls granted, by its charter, and averring, that "a mistake was evidently made, in recording the bill in form, or in some other manner, in regard to the sum allowed for a mail stage." The General Assembly passed an act, by the terms of which the company was " allowed to collect the same toll on carriages, which carry a mail on said road, as it was allowed, by its charter, to collect on other carriages of the same description." In *May* 1832, *P* petitioned the General Assembly for a repeal of this act; and cited in the turnpike company. The General Assembly found, that the application of the turnpike company was unknown to *A;* that the fact of his running a mail stage on said road, under a contract with the post-master-general, was not communicated to the General Assembly, by the turnpike company, though it was well known to that company and to its agent; and that the rate of toll upon mail stages was originally established to encourage the transportation of the mail in carriages; and thereupon passed an act repealing and annulling the act of 1829. In *assumpsit* by the turnpike company against *P,* for tolls accruing after the act of 1829, at the rate allowed by that act, it was held, 1. that the act of 1829 was not void, for want of notice to *P*; 2. that it was not void, by reason of the allegation of a mistake in the charter; 3. that it was not void, on the ground of a *suppressio veri;* 4. that it was a grant, as contradistinguished from a mere license, and consequently, was a contract, within the constitution of the *United States, art.* 1. *s.* 10; 5. that a consideration was not necessary to render the grant inviolable; 6. that if otherwise, this being a modification of the original grant, it was not without consideration; 7. that consequently, it was unaffected

New-Haven,
July, 1835.

The Derby
Turnpike Com-
pany
v.
Parks.

by the act of 1832, and the plaintiffs were entitled to recover the tolls demanded.

THIS was an action of *assumpsit* to recover tolls for passing the turnpike gate of the plaintiffs, on their road, with a mail stage, from the 1st of *July*, 1829, to the 2d of *August*, 1833.

The plaintiffs, in *May*, 1798, were incorporated as a Turnpike Company, with power to make a road from the court-house in *New-Haven* to *Derby Landing*, and, when completed, to establish a turnpike gate thereon; at which they were authorized to collect the following among other tolls :

|  | cts. | m. |
|---|---|---|
| " Every travelling pleasure four wheeled carriage | 25 | |
| Every mail stage, | 6 | 2 |
| Every other stage, | 25 | |
| Every loaded wagon or cart, | 12 | 5." |

One clause in the charter was in these words : " Said company shall, at all times, keep said turnpike road in good repair, at the expense of said company, so long as they shall receive said tolls." No power of revocation or alteration was reserved.

The road was made and completed, and the company were authorized to receive tolls thereon. In *January*, 1824, the defendant commenced running a mail stage thereon ; and has ever since continued to run it ; this being the only mail stage running on such road. In *October*, 1828, the defendant made a contract with the post-master-general to transport the *United States* mail from *New-Haven*, through *Derby*, to *Norfolk*, and back, three times a week. From that time he has continued, in pursuance of that and subsequent contracts, to carry the mail, in a stage, on said road ; it being the most convenient route from *New-Haven* to *Derby*. In *May*, 1829, the plaintiffs applied to the General Assembly for liberty to collect the same toll on said carriages as on other carriages of the same description, stating the tolls granted by their charter, and averring, that "a mistake was evidently made in recording the bill in form, or in some other manner, in regard to the sum allowed for a mail stage, which is only six cents, two mills, while every other stage and four wheeled pleasure carriage, is four times that amount." On this petition no notice was given to the defendant, or to any other person. The General Assembly granted thereon, that "said company be

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

allowed *to collect the same toll on carriages,* which carry a mail on said road, as they are now allowed, by their charter, to collect on other carriages of the same description." In *May,* 1832, the defendant made application to the General Assembly for a repeal of the last-mentioned act ; and the plaintiffs were cited in, appeared and were heard thereon. The facts above stated in regard to the defendant's contracts, and the carrying of the mail on said road, were found to be true. And it was further found, that the plaintiffs, with a view to obtain of the defendant a larger rate of toll for said mail stage, made said application, in the manner above stated, without any notice to him, or to the towns through which said road passes ; that said application was entirely unknown to him, the only person whose interest could be affected thereby ; nor was the fact of the defendant's running a mail stage on said road under a contract with the post-master-general, communicated to the General Assembly, by the plaintiffs, though it was well known to them and to their agent ; that the rate of toll upon mail stages was originally established, with a view to encourage the transportation of the mail in carriages ; that a small number of shares of stock had been sold after the act of 1829 and before that of 1832 ; that the average dividend has not been more than from $1\frac{1}{2}$ to 3 *per cent. per annum ;* and that in consequence of necessary repairs there probably would be none for a year and a half to come. The act of 1829 was thereupon repealed and annulled.

A case embracing these facts was agreed to, by the parties, and reserved for the consideration and advice of this court.

*Sherman* and *R. S. Baldwin,* for the plaintiffs, contended, 1. That the plaintiffs had a right to receive the increased toll after the passage of the act of 1829. The objection is, that this additional grant was improperly obtained, and was, therefore, originally void.

In the first place, it is said, that the defendant, who was running a mail stage, under a contract with the *United States,* was not notified, nor the towns through which the stage passed. But the defendant was no more entitled to notice than every other individual, who had or might have occasion to travel the road, unless he had some vested right, distinct from the public right which might be impaired. Suppose the

application had been to have the toll increased on one-horse wagons, must every traveller who had contracted to run such a vehicle, be made a party? Suppose the mail-contractor had lived in another state, must the legislature of *Connecticut* send him notice before they could provide for the support of a road, by increasing the toll? Every man who contracts to transport produce or passengers, whether over a common or a turnpike road, knows that unless he has a grant of some special privilege, he may be incidentally affected, by legislation embracing or regarding such road. If the legislature, who represent all public rights, suppose that any individual may be incidentally injured, they may and will direct him to be notified, if they think proper.

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Company
*v.*
Parks.

Notice to the towns was not necessary; for no corporate right of theirs was affected, or could be, by the alteration. Notice to them would not have been notice to the defendant.

Towns are required to be notified of an application for a road, because they have an interest in the question of its establishment as a road, arising from their legal obligation to provide and maintain all needful highways, &c. They are not notified as the representatives of any portion of the public rights of the inhabitants.

Secondly, it is said, there was a fraud upon the legislature. The first answer to this is, that it is not true in point of fact. It was suggested to the legislature, that there *appeared* to have been a mistake. Whether they acted on that supposition in making the alteration, or on public considerations, the act of 1829 does not state. Their reasons or motives cannot be enquired into. *Fletcher* v. *Peck,* 6 *Cranch,* 130.

But if there was a fraud, the legislature could not *adjudicate* upon the subject. The proper course was to try the question, on a *quo warranto* or other judicial proceeding, before a judicial tribunal. *Charles River Bridge* v. *Warren Bridge,* 7 *Pick.* 364. 371.

Again, it is said, that the act of 1829, was not valid, for want of consideration. In the first place, it is not necessary that there should be any consideration proved for a legislative grant. The legislature of a state can never be presumed to have acted without consideration in yielding to an individual or a company any portion of the public rights. The act is attended with all the deliberation of a security of the high-

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

est character. It is said, that the legislature is *estopped* to deny a consideration. *Fletcher* v. *Peck,* 6 *Cranch* 87. 136, 7. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 682.

But secondly, there was a sufficient consideration. This appears from the *nature* of the grant; which will be considered under the next point.

2. That the right of the plaintiffs to take the increased rate of toll under the act of 1829, was not affected by that of 1832. As the latter act purports to repeal and annul the former, this point depends upon the constitutional right of the General Assembly to pass the latter act; and this again depends upon the question whether the former act was *a contract* within the constitution of the *United States, art.* 1. *s.* 10. In 1798, the legislature, representing all the people of the state and all their rights, allowed the company, in consideration of their making the road, and keeping it in repair, to collect certain tolls specified in their charter. The road, when made and established, became a public highway, free to every person to use as such; and the corporation possessed, irrevocably, the franchise of collecting the specified tolls for keeping it in repair. When the charter was accepted by the company, a contract was formed, which it was beyond the power of either party to alter, without the consent of the other. *Dartmouth College* v. *Woodward,* 4 *Wheat.* 559. 675. To this contract, the legislature, representing the public, and the corporation, were the only parties; and like every other contract, it might, by the consent of both parties, be modified at their pleasure; and when so modified, whether by enlargement or diminution of the franchises of the company, such alterations became as much a part of the contract as if they originally existed. The consideration which the company give for their franchise is a *continuing* consideration—the maintenance of the road in repair. The object of the public is to secure this result in the best manner. Now, if the legislature was of opinion that the tolls originally allowed would not probably secure the permanent repair and preservation of the road; if it believed, that a higher rate of tolls would encourage the company to expend more in permanent repairs;—it was a wise exercise of power to increase it; and this increase being allowed, on the application of the company, it becomes a part of the original franchise, equally permanent and inviolable.

New-Haven,
July, 1835.

The Derby
Turnpike Com-
pany
*v.*
Parks.

It is competent to the legislative power of the state to con-troul, and regulate and limit, according to its own pleasure, the exercise of all public rights. It may authorize a company to take tolls for maintaining a highway in repair already existing, as well as a new one. Indeed, common highways are often made into turnpike roads. Suppose, then, such a grant were made to a turnpike company, to take tolls as long as they should keep the road in repair; would not this franchise be a *vested estate* in the company, irrevocable on the part of the state, even though it were left optional with the company to continue to maintain or to abandon the road, and with it the franchise? Such was the original grant to this company. The road became an unprofitable one. The legislature, as guardian of the public rights, deemed it proper to grant to the company greater inducements for the permanent maintenance of the road in repair. There is the same consideration—a *continuing* consideration—for the additional grant, as there was for that originally made; and is this any less a *contract* obligatory on the state, than that was?

*T. Smith* and *Seeley*, for the defendant, contended, 1. That the plaintiffs, as against the defendant, derived no rights under the resolve of the General Assembly of 1829.

At the time that resolve was obtained, the defendant was bound, by his contract with the government, to carry the *United States* mail over this road, in a stage coach: the contract was made with reference to the expense of transportation; and one important item of expense was the tolls which a stage coach was liable to pay. The plaintiffs, knowing that the defendant was bound, by his contract, to carry the mail daily on the route, secretly and clandestinely apply to the General Assembly for an increase of toll *fourfold* upon stage coaches; fraudulently concealing from the legislature the fact that the defendant (upon whom this *ex parte* legislation was intended to operate,) was using the road, upon the faith of the tolls, as they then existed; and making a false suggestion, as the ground of interference, that there was a *mistake* in recording the original charter. No mistake of that kind was shown to the legislature, and it is now admitted that there was none.

According to the rules which the courts have adopted in construing legislative acts of a private nature, the defendant ought

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

to be exempt from the operation of that resolve : it cannot be applied to him without gross injustice and oppression ; and it is not to be presumed, that the legislature would, knowingly, have interfered with the rights which had vested in the defendant, under his contract with the post-master-general. Such a power in the legislature may be exercised so as to involve a prohibition to carry the *United States* mail. If the tolls, with reference to which the government and a contractor enter into stipulations for carrying the mail for a term of years, may, as in this case, be increased, fourfold, without notice to any parties, they may ten or a hundred fold : the exercise of that power rests solely in the discretion of the legislature. But the doctrine of such a discretionary power in a state legislature, was expressly declared untenable, by the supreme court of the *United States,* in the cases where it was attempted to tax the *United States* bank. *McCulloch* v. *Maryland,* 4 *Wheat. Rep.* 316. *Osborn* v. *The United States Bank,* 9 *Wheat. Rep.* 738. The reasoning of the court in those two cases, goes, with still greater force, to show, that a private legislative act cannot impose a burden operating directly upon a contract previously made by the government and an individual, in pursuance of the laws and constitution of the *United States.* Here is an invasion of private vested rights, a direct attack upon this contractor ; if he fails to carry the mail daily over this road, he and his sureties forfeit their bond ; if he fulfils his stipulations, he is subjected to burdens which he could not have foreseen. The resolve of 1829 was, therefore, not only oppressive and unjust, but was opposed to that provision of the constitution, which protects contracts from legislative interference.

2. That the resolve of 1829, allowing the company to take an increased rate of tolls on mail stages, was not irrevocable. The general rule is, that one legislature is competent to repeal any law which a former legislature was competent to pass. But the constitution of the *United States* qualifies that sovereign power, and restrains the state legislature from impairing the obligation of contracts. It is not material who the parties to a contract are ; whether states, corporations, or natural persons ; they are all placed, by the constitution, upon the same footing ; as contracting parties, their rights and duties are fixed, by the terms of the contract, and are placed equally beyond legislative controul.

New-Haven,
July, 1835.
————————
The Derby
Turnpike Com-
pany
v.
Parks.

What, then, is to be deemed a *contract*, in the sense of the constitution? The decisions of the supreme court of the *United States* have settled this question,—that the framers of the constitution, by the term *contract*, as used in that instrument, intended a contract in the common law sense of the word;—*such* an agreement between two or more parties, as by the principles of the common law, *binds* the parties; and it is *that legal* obligation, which the constitution meant to protect unimpaired. Such has been the uniform doctrine from the case of *Fletcher* v. *Peck*, 6 *Cranch*, 135. to the present time. 3 *Story's Com.* 245. The plaintiffs, therefore, are bound to make out, that the resolve of 1829 imports a *contract*, according to the common law definition of the word, between the legislature and the company, whereby the company have become vested with the right of perpetually and irrevocably exacting the extra tolls mentioned in that resolve. Such contract, if any, arises by implication; for the resolve has none of the *forms* of a contract. Was it, then, an executed or executory contract? An executed contract, is one in which the object of it has been performed:—an executory contract, is one in which a party binds himself to do or not to do a particular thing. That classification of contracts was adopted in the case of *Fletcher* v. *Peck*, and has been recognised in all the subsequent cases. Now, the intent of the resolve in question was, to "allow" the company to collect the extra toll on mail coaches for the *future* ;—the operation of it was to be future; the object of it was *not* performed, but was *to be* performed from time to time thereafter, as the road should be used by mail coaches; it solely contemplated something *yet to be done*, like a stipulation to pay an annuity, or annual interest or quarterly rent, in its nature wholly executory, and in no sense executed. It is like the case put by Ch. J. *Marshall*, in *Fletcher* v. *Peck*, to illustrate the distinction between contracts executed and executory. *There*, the legislature of *Georgia* passed an act requiring certain lands to be sold to the individuals named in the act; and authorised the governor to issue and sign the grant. The question in that case was, whether the grant, so made, was a contract within the meaning of the constitution. The Chief Justice, in giving the opinion of the court, adopting the common law definition of contracts and their classification into executory and executed, says, that the *law* under which the

New-Haven,
July, 1835.

The Derby
Turnpike Com.
pany
v.
Parks.

conveyance was made by the governor, was *executory*, and the *grant*, when made by the governor, was an *executed* contract. The case which he puts, is exactly parallel to the present. *Here*, the power given by the resolve of 1829, to the company, to collect the extra tolls, was to be carried into effect thereafter, like the *Georgia* act mentioned by Ch. J. *Marshall :* as the tolls were collected from time to time, the authority conferred by that resolve, was, *pro tanto*, executed; its object was so far accomplished ; just, as in *Fletcher* v. *Peck*, the object of the act was accomplished, by the grant issued and signed by the governor, by virtue of the act. But as to the *future* tolls,—as to every thing upon which the act of 1832 professed to operate—the resolve of 1829 was executory. In *Flecher* v. *Peck*, the court said the conveyance (*i. e.* of the land in that case) being made, nothing more remained to be done ; the contract was executed ; the grant, the livery of the land, extinguished the right of the grantor ; and it implied a contract, not to reassert that right. So here, the receiving of the tolls, by the company, from day to day, is, to that extent, an execution of the authority given by the resolve ; those tolls the company are entitled to hold ; for there has been a *manual tradition* of them into the hands of the grantee ; but as to all future tolls, the resolve is still to be executed ; and, if it implies a contract, it is an executory contract.

But the counsel for the plaintiffs insist, that here was a grant of a franchise ; and that a grant is said, in the books, to be a *contract executed*. In some loose sense of the word, every contract may be styled a grant ; for it gives, or grants, some right, to one of the contracting parties ; and, in that sense, all executory contracts are " grants :" it is only in that loose sense of the word, which entirely confounds the distinction between contracts executed and executory, that the resolve of 1829 can be called an *executed* contract. So, a license to practise law, or physic, or to keep a tavern, is a grant ; for, it confers a power, or privilege ; but it contemplates the future. A grant, therefore, taken in a large sense, may import a thing executed, or executory ; it is indifferent which ; the object of the grant may be something performed. by the act of making the grant, and it is *then* executed ; or, something yet to be done, and it is *then* executory ; and that is the true test. It is in accordance with that distinction, and founded expressly upon it, that the

observations of the court are to be understood in the case of *Fletcher* v. *Peck*. In that case, the words "grant" and "conveyance" are used synonymously, and applied to an estate in land, where the right, and the possession of the thing granted, are transferred, by the same act. "A law," says Ch. J. *Marshall*, "annulling conveyances between individuals, and declaring that the grantors should stand seised of their former estates, notwithstanding those *grants*, would be as repugnant to the constitution, as a law discharging the vendors of property from the obligation of executing their contracts by conveyances. It would be strange if a contract to convey, were secured by the constitution, while an absolute conveyance remained unprotected." 6 *Cranch* 137. It is in the same sense that *Blackstone* says, "a true and proper gift or grant, is always accompanied with delivery of possession, and takes effect immediately ; as if *A* gives *B* 100*l.* or a flock of sheep, and puts him in possession of them directly ; it is then a gift executed in the donee ; and it is not in the donor's power to retract it, though he did it without any consideration or recompense." 2 *Bla. Com.* 441. Again, "a contract may also be either *executed,* as if *A* agrees to change horses with *B,* and they do it immediately ; in which case, the possession and the right are transferred together ; or it may be executory, as if they agree to change next week ; here the right only vests, and their reciprocal property in each other's horse, is not in possession but in action ; for a contract *executed,* (which differs nothing from a grant,) conveys a *chose in possession ;* a contract executory conveys only a *chose in action.*" *Ibid.* 443. So in *Terret* v. *Taylor,* 9 *Cranch,* 43. the court held, that a legislative grant of lands vested an indefeasible and irrevocable title. All the authorities adopt the same test. 3 *Story's Com.* 241. 242. 257. 258. 4 *Wheat.* 510. 1 *Kent's Com.* 389. The right to take toll of a traveller upon a road, whether it be called a grant, a license, authority, or by whatever name it be called, is not material : it is still executory, in the same sense, that the right to exact payment of a promissory note, is executory ; and the authorities, properly understood, sustain that position. Nor can it be said, that the supposed contract implied in the resolve of 1829 was executed, because nothing more remained for the legislature to do, after passing that resolve ; for, the state, according to the argument on the other side, was bound, from day to day, to the end of time, to enforce the company's right to de-

*New-Haven,*
July, 1835.

The Derby
Turnpike Com-
pany
*v.*
Parks.

mand the extra toll, in the same manner that an individual who should enter into a contract to pay money by instalments, or to do any other series of future acts, would be bound to fulfil that engagement, till it expired by its own limitation. The two cases are parallel; for it can make no difference whether a party stipulates, that *another* shall do an act, or to do it himself: it is *the thing to be done*, which characterizes its nature, and not the hand that does it. Here, the legislature, instead of stipulating to pay these daily tolls out of its own treasury, stipulated, in substance, for the same thing, by making it the duty of the public, forever thereafter, to pay those tolls to this company, immortal in its very nature. It is the non-performance of this executory agreement, on the part of the state, of which the plaintiffs complain; for, they say, that they still have a legal right to those accruing tolls, in virtue of their contract with the legislature in 1829; and the state, by a legislative act, in 1832, refused to enforce the payment of those tolls, and has ever since closed its courts against their just demands.

In every view, therefore, the contract, if any, implied in the resolve of 1829, was *executory.* That position being established, the question arises and becomes all-important, whether there was any consideration for that agreement. An *executed* contract is good, without a consideration; but an *executory* contract must be founded upon a sufficient consideration; otherwise, it is a mere naked agreement, and is totally void in law. 2 *Bla. Com.* 444, 5. *Ita lex scripta est.* The case of *Fletcher* v. *Peck*, which established the principle that has governed all subsequent cases, decided, that the constitution meant to preserve the inviolability of all contracts *valid at common law*, placing all parties capable of entering into a contract, whether state sovereignties, natural or artificial persons, upon the same footing. Every case down to the present time, has assumed that principle, as a postulate. The case of *New-Jersey* v. *Wilson*, 7 *Cranch* 164. is full to the same effect, and proceeds entirely upon the ground, that a consideration is essential to a binding contract, within the meaning of the constitution, whether it be entered into by a state or an individual.

In the case of *Dartmouth College* v. *Woodward*, 4 *Wheat.* 592. the counsel for the college, *arguendo*, place their whole case on the position that the charter involved a contract, in the

common law sense of the term, founded upon a valuable and sufficient consideration. The court, in giving their reasons for the judgment in that case, place it upon the same ground. *Marshall*, Ch. J. (*p.* 644.) says : " It is a contract made on a valuable consideration. It is a contract for the security and disposal of property. It is a contract on the faith of which real and personal estate has been conveyed to the corporation. It is then a contract within the letter of the constitution, and within its spirit too," &c. So *Washington*, J. is full to the same effect, labouring to show, that the charter had all the common law requisites of a contract : "certain obligations," says he, " are created, binding both on the grantor and the grantees." " The obligation imposed upon the grantees, and which forms the consideration of the grant, is that of acting up to the end and design for which they were created by their founder." (*Ib.* 658.) *Story*, J. goes elaborately into the same question, and concludes by saying, that " a valuable consideration did exist, to the founder, the trustees and the benefactors." (*Ib.* 690.) In the way of authority, nothing can be more decisive ; and it is here to be noted, that the doctrine of an implied contract in the grant of a corporate franchise, has never been carried beyond the principles recognized in the *Dartmouth College* case. Nor is there any authority, rightly understood, which at all conflicts with, or qualifies, these principles.

We come now to the question whether there was any consideration for the resolve of 1829. The operative words of that resolve are, that the company " be *allowed* to collect the same toll," &c. This resolve does not purport to be founded upon any corresponding benefit to the public ; it imposes no new obligation upon the company ; nor does it extend, increase, or vary any former obligations, which were already as complete, as, in their nature, they could be : no property is pledged upon the faith of it ; no responsibility is incurred ; no semblance of a duty assumed. There is nothing which, in any view, can be regarded in the light of a consideration : it is a nude pact, and therefore, void. 2 *Bla. Com.* 445. For the same reasons, it does not fall within the principle of any of the decisions of the supreme court of the *United States.* It purports, on the face of it, to be a mere naked authority ; it is an " allowance,"—a permission,—a license,—which, the party granting it, may, at any time, withdraw, and leave the grantees in the full enjoy-

*New-Haven,*
July, 1835.

The Derby
Turnpike Company
*v.*
Parks.

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

ment of every privilege for which they stipulated. This extra toll is a mere bounty, which the legislature may withhold, without impairing any right, in the same manner that they may stop a pension to a soldier, or annul a statutory provision for the poor. Had the legislature authorized the company to draw upon the state treasury, from time to time, for an amount equal to the extra toll for the same period, it would have been the same in principle with the present resolve. So far, in each of these cases, as any thing may have been *paid,* it is executed and irrevocable; but the continuance of it for the future rests in the gratuitous favour of the state. In 1828, the legislature, on the petition of a large number of millers, authorized them to take an increased rate of toll; does that grant imply a contract with the millers, in the sense of the constitution, so that they have a vested right to that increased rate of toll, which cannot be revoked by the legislature? Or, is the right of a miller to take toll, a less valuable franchise, than the like right in a turnpike company? In point of consideration for their respective grants, they both stand upon the same footing, *neither* having paid any,—both grants are *ex speciali gratia.* They are both, in form and substance, identical. The fact of there being *one* grantee in one case, and a *large number* of grantees, in the other case, make no difference; for it has been settled, in reference to legislative acts involving contracts, that the constitution protects the contract and all persons, more or less, who are parties to it—a particular grant to one, or a like grant to all, in like circumstances, if it be a contract, is equally beyond the reach of a repealing act. *Atwater* v. *Woodbridge,* 6 *Conn. Rep.* 230. Suppose a bank chartered with power to issue notes payable on demand, for five dollars or more; and a subsequent legislature "allows" the bank to issue post notes, or notes less than five dollars; would that liberty or franchise, be an irrevocable contract? Such privilege might be of great value to the corporation; and certainly, not less worthy of protection than an allowance of extra toll to a turnpike company. It is a power conferred by the legislature, which grants a license to a lawyer, a physician, or tavern-keeper; and the grant is valuable to him; but may not the sovereignty with-draw that privilege, at pleasure, and place the individual under the operation of the general law, which prohibits the right of acting in those vocations, without a special grant? Indeed,

these cases present more the character of a contract than that now before the court; for those vocations impose legal responsibilities upon the parties, acting in them, and inflict no burden upon the public; but the resolve of 1829, asks nothing of the company, in return for the extra tolls, while it subjects the public to a charge.

The claim now set up by the plaintiffs, will appear still more untenable, considered with reference to a settled rule of law already adverted to,—that a prerogative grant, at the suit of a grantee, shall be taken most beneficially for the public, and against the grantor; it shall not enure to any other intent than that which is precisely expressed in the grant : nothing shall be taken by implication. 2 *Bla. Com.* 347. In the case of *Boulton* v. *Bull*, 2 *H. Bla.* 474., *Buller*, J., speaking of a grant of a patent by act of Parliament, says : " Though this, therefore, is a grant of a monopoly, by the legislature, yet it is to receive precisely the same construction, as if it had been a grant of letters patent," *i. e.* by the king. So 7 *Conn. Rep.* 199. per *Hosmer*, Ch. J. 10 *Conn. Rep.* 166. per *Williams*, Ch. J. Now, against the spirit of this rule, the court are called upon to pronounce, that the resolve of 1829, by *implication*, involves a contract; and even that implication is a forced one; for the language of the resolve purports to be a mere license; and the intendment is carried still further, when it is claimed, that the license is perpetual and irrevocable.

Thus, it appears, that the claim of the plaintiffs, is neither founded in principle, nor supported by authority. The grant in question, was not merely revocable, but in *Great-Britain*, it would have been *per se* void. For, " where the subjects have a right of way, it is not in the power of the crown to throw a charge upon them, without some consideration. The ground on which the doctrine is founded, is, that there must be a *quid pro quo*." Per *Ashhurst* and *Buller*, Js. 1 *T. R.* 668, 9. 2 *Bl. Com.* 38. For the same reason, the crown cannot increase an ancient charge, without a valuable consideration. *Com. Dig.* tit. Prerogative. (D. 48.) also *tit.* Toll (C.) *Toll Thorough.* Toll upon a public highway cannot even be prescribed for, without setting forth the consideration upon which it was granted. (*Ibid.*) " Bridges and ferries are *publici juris.* A toll is granted for a service rendered to the public." Per *Putnam*, J. 7 *Pick. Rep.* 496. A gratuitous imposition of a public bur-

*New-Haven,*
July, 1835.

The Derby
Turnpike Company
*v.*
Parks.

HARTFORD LAW LIBRARY

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

den, for private benefit, is a thing unknown to the law. But admitting that the omnipotence of Parliament *might* grant a new toll, or increase an old one, without a consideration, it is equally true, that the restricted construction of private acts,—a rule so distinctly laid down in the books,—would exclude all fair pretence for claiming the resolve in question to be a contract in any sense known to the common law. These authorities show, in a strong light, the inapplicability to the present case of the conceded doctrine, that a contract executed is good without a valuable consideration.

The view which has been taken of this case, renders it unnecessary to consider the question, whether a legislative act, in its nature importing a contract, can be repealed, on the ground that it was obtained by fraud and imposition. If a fraud has been practiced upon a court of justice, the wisdom of the law has provided ample remedy; if the *legislature* is deceived into a grant, is there no redress? The petition of the plaintiffs, on which the resolve of 1829 was passed, states, as the ground of that application, a supposed mistake in the original charter, and asks to have it rectified. It being now admitted, there was no such mistake, the suggestion was a false one; there was also a suppression and concealment of the fact, that the grant asked for, would operate directly upon the rights of the defendant under his contract with the post-office department. In 1832, the plaintiffs were summoned to appear before the legislature to show cause why the grant so obtained should not be repealed; the fraud charged upon the company was amply substantiated, and, after full defence, the obnoxious resolve was annulled, and the defendant restored to those rights which were guarantied to him, by the law of the land, and of which, the legislature, through the mal-practice of the plaintiffs, had been made, unwittingly, the instrument of depriving him. The plaintiffs now claim, that the grant having been *in fact* obtained, no matter by what means, the legislature are inhibited, by the constitution, from rescinding it; and in support of this claim, they cite the leading case of *Fletcher* v. *Peck.* But that case by no means sustains the position; for (conceding, for argument's sake, that the resolve of 1829, was, as the plaintiffs assume, in substance, a contract,) it is to be observed, that the land there alleged to have been obtained from the *Georgia* legislature, through the corruption of its members, was not, when the ques-

tion arose, in the hands of the grantees charged with the al- *New-Haven,*
leged mal-practice, but of *another innocent* party ; and it is  July, 1835.
upon *that* distinction, that the decision was placed by the court. The Derby
" If the original transaction," says Ch. J. *Marshall,* "was in-  Turnpike Com-
fected with fraud, these purchasers did not participate in it, and  pany
had no notice of it.   They were innocent.   Yet the legislature  *v.*
of *Georgia* has involved them in the fate of the *first* parties to  Parks.
the transaction."   6 *Cranch,* 132.   Again—" In this case, the
legislature may have had ample proof, that the original grant
was obtained by practices, which can never be too much rep-
robated, and which would have *justified its abrogation, so
far as respected those to whom the crime was imputable.*"
" This estate was transferable ; and those who purchased
parts of it, were not stained by that guilt which infected the
original transaction."   *Ib.* 134.   And the judgment in that
case concludes with these words : " It is, then, the unanimous
opinion of the court, that in this case, the estate having passed
into the hands of a purchaser for a valuable consideration,
without notice, the state of *Georgia* was restrained, either by
general principles, which are common to our free institutions,
or by the particular provisions of the constitution of the *United
States,* from passing a law, whereby the estate of the plaintiff
in the premises so purchased could be constitutionally and legal-
ly impaired and rendered null and void."   *Ib.* 139.   The opinion
of the supreme court in the case of *Fletcher* v. *Peck,* therefore,
is an authority in favour of the position, that, as between the
state and its immediate grantee, a grant obtained by improper
practices, may be revoked, by the legislature.

The plaintiffs, admitting the necessity of some mode of
relief in such a case, cite a single *dictum* from 7 *Pick. Rep.*
371., that a *quo warranto* is the proper remedy ; but their
inference from the *dictum* is a *non sequitur ;* for, that remedy
would by no means exclude the right of the legislature to
interfere.   On this point *Fletcher* v. *Peck* is again an author-
ity for the defendant ; for the court there express a strong
doubt, whether " an act of the supreme sovereign power might
be declared null, by a court, in consequence of the means
which procured it :" (6 *Cranch* 130.)—and they intimate the
insurmountable difficulties, which a court of justice would find,
in declaring a legislative act void, by investigating the motives
and inducements which led to it.   *Ib.*   If an act of the legis-

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

lature have all the forms of law, and be within the constitutional powers of that body, it would seem, that courts must be bound by it, until it was repealed, by its framers, unless some statute gives them jurisdiction, as in *New-York*. *2 Rev. Code* 578. Besides, a *quo warranto*, in such a case, would be entirely novel in this state. The defendant, therefore, in going to the legislature for a restoration to his rights, adopted a constitutional remedy.

Upon these several grounds, we insist, that the resolve of 1829, was legally repealed, by that of 1832.

WILLIAMS, Ch. J. The questions to be decided, are, had the plaintiffs a right to take increased tolls under the act of 1829? And if so, is that act repealed or annulled, by the resolve of 1832?

It has been claimed, that the act of 1829, is of no force or efficacy; that it was obtained under such circumstances as to constitute moral fraud; that it was an attack upon the rights of the defendant, without any notice to him, and by suppression of the truth and suggestion of falsehood. Whether the facts upon which the defendant relies in proof of this claim, are so placed before the Court, as that we should be bound to regard them, is not now a matter of enquiry. It is only alluded to, to show, that that point is not either admitted or denied. As the case has been argued upon the supposition, that the facts found by the General Assembly are proved here, we will examine whether they are sufficient for us to say, that the act of 1829 was obtained by fraud.

No notice was given to this defendant of the intended application for an alteration of tolls. We have a general statute regarding notice to be given, in all cases, to the *adverse party*, before trial. Now, if *Parks* stood in the relation of an adverse party, then a grant made by the General Assembly, upon a petition, when he was not cited, would be, against him at least, null and void. That he was in this situation has not been contended. So long as he chose to carry the mail upon this road in a stage coach, he had an interest in having the tolls low: and so had every person who might in future carry a mail, in the same way. But it is not shewn even that he was bound to carry the mail on the road, though it might be more convenient for him to do so. In carrying it there, he consult-

ed his own convenience, and not any stipulation he had entered into.

*New-Haven,*
July, 1835.

The Derby
Turnpike Company
*v.*
Parks.

If, then, the law did not require notice to be given him, it certainly would be too much for this Court to say, that an application to the Assembly for a franchise was fraudulent, because the petitioner had not given such notice. As was said in a case somewhat analogous, " the injury is to be ascribed to the law, not to the individual who has complied with its requition." 7 *Cranch* 50. We do not say but that notice, in such cases, ought always to be required, that all may be heard, who feel any interest in the subject. The modern practice has been not to act in such cases until notice in a public newspaper has been given, that such a case is pending. But, it is believed, the first time that it has been urged, that unless it was given, the grant was void. Such a decision would destroy many of the ancient grants in this state; and is warranted by no authority whatever.

It is said, that there was a false suggestion, which ought to make void this grant. The petition states, that there was a mistake in recording the former bill, or in some other way, whereas it is now found, that there was no mistake, but it was designed to encourage mail-carriers. Is this such a fraud as shall set aside a grant ? It has been held, that the facts stated in a bill in chancery are not evidence against the party filing it, in another case between the same parties, of the facts charged in it. *Doe* d. *Bowerman* v. *Sybourn,* 2 *Esp. Rep.* 496. 498. S. C. 7 *Term Rep.* 2.

But what are the facts charged in that petition ? That a mistake was evidently made in recording the bill in form, *or in some other manner ;* the toll being but 6¼ cents, while other stage and pleasure carriages with four wheels, are subject to four times that amount of toll. From the manner in which this allegation is made, it seems, that the mistake charged was claimed to be proved, by the accompanying facts, *viz* the disproportion in the toll to that upon other similar vehicles. It is said to be *evidently* made; and the proof offered is, that like carriages are charged four times as much. It is but the allegation of the draftsman, supported, as he claims, by the facts. This inference may have been erroneous; but it does not therefore follow, that it was fraudulent. If this was all that was intended, the General Assembly could draw their own inference as well

*New-Haven,*
*July, 1835.*

*The Derby
Turnpike Com-
pany
v.
Parks.*

as the petitioners. If they considered this sufficient proof of the fact, the inference certainly could not have been deemed entirely unfounded. If there was other proof of the fact, that proof was either true or false. If false, the defendant ought to show it, before he can claim this was obtained on false suggestion; and if true, we surely cannot say the suggestion in the petition was fraudulent, when there was proof to support it.

It was also claimed, that the petitioners suppressed the truth. They knew, it was said, that the defendant had made the contract with the post-master-general to carry the mail; and that a mail had long been, and then was, transported on said road. Now, it does not appear, that the defendant was bound, by his contract, to transport the mail upon this road; though it does appear, he was obliged to transport it from *New-Haven* to *Norfolk* and back. Of course, it does not appear, that the petitioners knew that fact, or that it existed. There was, then, no fraud, in not stating that fact. But they did know, that the defendant, in executing his contract, did in fact run his mail carriage upon this road, and had done so for years.

Nor was this fact one of that kind, which it was fraudulent to conceal. It is difficult to conceive of a fact more notorious, than that a mail stage has, for a numbers of years, been running every day in the week, except *Sunday,* upon a great public road; and it is hardly possible to suppose, that a fact of such notoriety could have been concealed from a body of men, composed, like our legislature, of members from every town in the state. At all events, it would be too much to say, that because that fact was not made known to the Assembly, it was *fraudulently* suppressed. Fraud is not to be presumed; and when this court are called upon, in this collateral manner, to declare void an act of the General Assembly, upon the ground that it was fraudulently obtained, this fact should be clearly proved. In the opinion of the court, no such inference can be drawn from any one of these facts, or from all of them combined.

It is unfortunate that notice had not been required, by the General Assembly; but as they, in the exercise of a discretion which they had a right to exercise, have not done this, the court cannot say that their act is void. On the other hand, there is no doubt that this resolve gave a perfect right to these plaintiffs to collect tolls under it, while it remained in force.

*New-Haven,*
July, 1835.

The Derby
Turnpike Com-
pany
*v.*
Parks.

This brings us to inquire, in the next place, whether that resolve has been annulled, by the one of 1832.

There can be no doubt of this, provided the legislature had the constitutional right, under the circumstances disclosed, to annul that act.   By a most valuable provision of the constitution of the *United States,* no state can pass any law impairing the obligation of contracts.  Such laws may sometimes be passed hastily, and without noticing what is to be their operation ; or they may be passed upon occasions of great distress, under an idea that private interests must yield to public good, as was the case with the tender laws during the revolution.   Under this provision of the constitution, it has been decided, that a grant is a *contract,* and, of course, cannot thus be impaired.   This has been solemnly adjudged, by the supreme court of the *United States,* whose peculiar duty it is, to settle constitutional questions. *Fletcher* v. *Peck,* 6 *Cranch,* 136, 7.   *Dartmouth College* v. *Woodward,* 4 *Wheat.* 518.  The former was a grant of land, the latter of a franchise ; and both were held inviolable.   Indeed, that a legislature can no more revoke its grants than the donor his gift, when delivered, is now to be considered as a principle perfectly well settled.   Several years before the case of *Fletcher* v. *Peck,* it was said, by one of our most eminent jurists, that "rights legally vested in any corporation, cannot be controuled or destroyed, by any subsequent statute, unless a power for that purpose be reserved to the legislature in the act of incorporation."   *Wales* v. *Stetson,* 2 *Mass. Rep.* 146. The same principle was fully recognized, by this court, in the case of the *Enfield Toll Bridge Company* v. *The Connecticut River Company,* 7 *Conn. Rep.* 44. and by the supreme court of *New-York,* in the case of *The People* v. *Platt,* 17 *Johns. Rep.* 215.   Such a grant, it is said, vests an indefeasible, irrevocable title.   Indeed, this general principle has not yet been denied.

But it is said, that it does not apply to this case, because here was no consideration.   The first answer to this is, that no case has been shewn to prove, that a consideration is necessary.  If that rule was to prevail, why is it necessary there should be any act of revocation at all ?   If a consideration was necessary, it would seem, that the grant was void for want of it ; and, of course, needed no revocation.   If good before the revocation, then it is not easy to see how the grantor could avoid it.  If good, it must be because the right had passed from the grantor

*New-Haven,*
*July, 1835.*

The Derby
Turnpike Com-
pany
*v.*
Parks.

to the grantee; and if it had once passed and a right vested, surely it could not be divested, at the pleasure of the grantor.

In the case of a gift by an individual, saying he gave an article, without delivery, it would be revocable; or, to speak more correctly, it never was given. But if the article is once delivered, it can no more be recalled than if he had received as a consideration the full value. This point was much considered and elaborately discussed, by *Story,* J. in the *Dartmouth College* case. He says : " Where a contract has once passed *bona fide* into grant, neither the king, nor any private person, who may be the grantor, can recall the grant of the property, although the conveyance may have been purely voluntary. A gift completely executed is irrevocable. The property conveyed by it, becomes, as against the donor, the absolute property of the donee ; and no subsequent change of intention of the donor can change the rights of the donee." 4 *Wheat.* 683. Again, this enlightened jurist says : " The government has no power to revoke a grant even of its own funds, when given to a private person or corporation for special uses. It cannot recall its own endowments, granted to any hospital, or college, or city, or town, for the use of such corporations." 4 *Wheat.* 698.

It is said, this question was not necessary to a decision in that case. It was a question argued at the bar, and which, therefore, fairly arose in the case ; and an opinion therefore upon it, if not absolutely necessary to the result, was not an *obiter* opinion. Those who would question this opinion, should be able to produce some authority against it. Until that can be done, this court have no hesitation in adopting it.

A case was cited from *Com. Dig.* that *toll thorough,* that is, toll on the king's highway, cannot be claimed simply, without any consideration. If that doctrine is to be recognized here, and applies to a grant of toll not on a public highway, properly so called, but on a road where toll is now demandable, then it proves, that this toll could never have been legally taken under the act of 1829. But the question in *England* was rather as to the extent of the prerogative of the king ; and it was held, that "the common law had so admeasured his prerogatives, that they shall not take away nor prejudice the inheritance of any." *Plowd. Com.* 236. And in the case of *Davy* v. *Allen, Noy,* 176. it is said, by counsel, to be agreed, that "the king

cannot grant toll to be taken in the highway, which is free ; <span style="float:right"><em>New-Haven,</em><br>July, 1835.</span>
because it is to deprive the subject of his common right and in-
heritance." 2 *Wils.* 299.

<em>The Derby<br>Turnpike Com-<br>pany<br>v.<br>Parks.</em>

The legislative power in this country is not limited by the
same rules as the prerogative of the king in *England.* It is
rather to be compared with that of the parliament, except as it
is limited by the constitution. This authority, therefore, is not
applicable to a legislative grant.

But if it was, what is this grant ? Is it to be considered as
an original grant to a company, and a charge on the public
without consideration ? Or is it merely a modification of the
original grant ?

The turnpike company have granted to them a charter with
a certain toll. This toll is found inadequate to the support of
the road and a reasonable compensation to the proprietors. Can
it be said, that an additional toll is without consideration ? In
this case, the company claimed it as a part of the grant origi-
nally intended to be made ; and under this impression, doubt-
less, the General Assembly granted it. So it is claimed by the
defendant, in another part of the case ; and we do not see
why this act (without reference to subsequent proceedings) may
not be fairly considered as an explanation of the original act,
and treated as a part of it. And in that point of view, there
can be no foundation for the argument, that this is to be con-
sidered merely as a *license.* Whether it is considered as an
explanation of the original grant, or an addition founded upon
the idea that the tolls received did not form a reasonable com-
pensation for the expences, it is equally valid. It has been
compared to cases of laws giving a bounty for the destruction
of birds or beasts of prey, or providing a compensation to mil-
lers. General laws of this kind, for whole classes of men,
have not been considered as in the nature of franchises or pri-
vate grants. If, therefore, they are revocable, it will not apply
to cases of this kind.

Whether any of these questions, as to the act of 1829, can
be made, or whether the validity of that grant can be tried,
except upon a process adapted specially to that purpose, are
questions, which, in the view taken of the case, need not be
discussed ; as we are not disposed to question a legislative act
any further than the exigencies of the case demand. But when
it is claimed, that an act interferes with constitutional rights,

*New-Haven,*
*July, 1835.*
──────────
*The Derby*
*Turnpike Com-*
*pany*
*v.*
*Parks.*

the enquiry cannot be avoided, without a gross dereliction of duty. The result of that enquiry has been, that the act of 1832 can have no effect whatever upon the rights of the plaintiffs, under the resolve of 1829. The court are thus imperatively bound to declare, that the act of 1829 remains unaffected and unimpaired ; and that the plaintiffs have a right to collect the toll granted thereby.

We advise the superior court to render judgment for the plaintiffs.

The other Judges concurred in this opinion.

Judgment for plaintiffs.