No. 23.—The Flint River Steamboat Company, plaintiff in er-
ror, *vs.* Nelson P. Foster, defendant.

   [1.] An Act to be in derogation of common right, must be confined in its pro-
visions to a particular individual, or set of men, separate and apart from the
rest of the community.

   [2.] The Legislature being the sovereign power in the State, while acting
within the  pale of its constitutional competency, is the province of the
Courts to interpret its mandates, and their duty to obey them, however absurd
and unreasonable they may appear.

   [3.] As a general rule, a defendant must have notice, actual or constructive;
otherwise no valid judgment can be rendered against him.   To this principle
there are several exceptions: 1st. The Legislature may dispense with notice.
If the expressions used in the statute will admit of a doubt, it will not then
be presumed that such a construction was intended, the consequences of which
are so unreasonable.   But where the signification is plain, there is no  power
of this dispensation in the Courts.   2dly. Notice before judgment is not es-
sential where the statute itself provides specific means of relief.

   [4.] If an act of the Legislature is in contravention of the Constitution, either
State or federal, it is, *ipso facto*, void, and it is the duty of the Courts so to

declare it. But they will not pronounce a statute a nullity, except in a plain and palpable case.

[5.] The laws of Georgia may be thus graduated with regard to their authority: 1. The Constitution of the United States. 2. Treaties. 3. Laws of the United States, made in pursuance of the Constitution. 4. Constitution of the States. 5. The Statutes of the State. 6. Provincial acts that were in force and binding on the 14th day of May, 1776, so far as they are not contrary to the Constitution, laws, and form of government of the State. 7. The Common Law of England, and such of the Statute Laws as were usually in force before the Revolution, with the foregoing limitation.

[6.] General observations on *trial by jury* as guarantied to the people of this country, and assigning reasons why it is essential in *criminal*, and not in *civil* cases.

[7.] The provision in the Constitution of Georgia, that "*trial by jury, as heretofore used, shall remain inviolate,*" means, that it shall not be taken away, in cases where it existed when that instrument was adopted in 1798; and not *that there must be a jury in all cases.*

[8.] Trial by jury is a privilege which may be waived. And when the defendant has an opportunity to demand it, and omits to do so, he cannot complain that it is denied.

[9.] An Act of the Legislature, authorising a judgment to be rendered without the intervention of a jury, is not, on that account, unconstitutional.

[10.] Trial by jury may be clogged with onerous conditions, yet the act prescribing such terms will not be pronounced unconstitutional, unless it totally prostrates the right, or renders it wholly unavailing to the defendant, for his protection.

[11.] The words of Magna Charta, that "no freeman shall be taken or imprisoned, or be disseised of his freehold, or liberties, or free customs, or be outlawed, or exiled, or any otherwise destroyed, or passed upon, or condemned, but by lawful judgment of his peers, or by the law of the land," were intended to secure the individual from the arbitrary exercise of the powers of government, (such as arbitrary impeachments, arbitrary methods of prosecuting pretended offences, arbitrary punishments upon arbitrary convictions,) unrestrained by the established principles of private rights and distributive justice.

[12.] The Acts of the Legislature of Georgia, of 1841 and 1845, giving a summary remedy to all persons employed on steamboats and other water-craft, on the Chattahoochee, Altamaha, Ocmulgee and Flint Rivers, to recover their wages, and for wood and provision furnished, &c. are not repugnant to the Constitution of the United States, or of the State of Georgia.

Summary process against the Flint River Steamboat Company, decided by Judge WARREN, in Decatur Superior Court, June Term, 1848.

The facts are sufficiently incorporated in the opinion of the Court.

SNEED, SULLIVAN & DUDLEY, and CRAWFORD, for plaintiff in error, submitted the following points and authorities:

1st. The Act giving the lien is in violation of the fifth article of the amendment of the Constitution of the United States, which declares that a man shall not be deprived of his property without due process of law.   *Amendments Constitution U. S. Art.* 5.   6 *Mass.* 309.     4 *Dallas*, 233.    4 *Mass.* 627.    1 *Brock.* 388.    3 *John.* 475.    15 *John.* 537.    *Story on Constitution*, 661.

2d. The Act is in violation of seventh article of Amendments Constitution U. S. because it restricts the right of trial by jury. *Amendments Constitution U. S. Art.* 7.    4 *Wheaton*, 243.    4 *Harris & McHenry*, 465.    2 *Murphy*, 44, 45.

3d. The Act also violates the Constitution of the State of Georgia, which secures the right of trial by jury.    *Constitution State of Georgia, art.* 4, *sect.* 5, *Cobb*, 729.

PLATT & SPICER, and J. LAW, for defendant, submitted:

The words " trial by jury, as heretofore used in this State, shall remain inviolate," means trial by jury at Common Law.

In the Constitution of the United States, the Common Law is expressed in words.

In admiralty, trial by jury is not secured.    3 *Story on Constitution, page* 645.

The Act of Congress of 1789, ch. 20, cotemporaneous with the amendment of the federal Constitution, and intends to carry out the clause of the Constitution united under the amendment, does not extend the right of trial by jury to admiralty and *maratime* jurisdiction.    3 *story's Commentaries on the Constitution*, 646. And therefore, in maratime jurisdiction, cannot be amended as of constitutional right.

In maratime questions the local law of a State as to liens, will be enforced in admiralty.    3 *Peters' Digest, page* 19, *case* 24. 3 *Peters' Digest, page* 23, *case* 78.

The Statute creating the lien upon steamboats and other water craft, navigating certain rivers, is in the nature of a maratime statute, and will receive a far more liberal construction than statutes relating to Common Law rights and Common Law rem-

emedies. First, the Statute, see *Pamphlet* 1841, *page* 167. For its extension, see *Pamphlet* 1845, *page* 152.

The Statute, however, secures all the rights of trial by jury, known to the judiciary of 1799, or any or all the amendments thereto, and therefore is constitutional. *Emrick vs. Harris,* 1 *Binney,* 416. *Kiddy vs. Moore,* 2 *Murphy,* 41. *Wilson vs. Simonton,* 2 *Hawk's,* 482. *Livingston vs. Mayor N. Y.* 8 *Wendall,* 100. *Craig vs. Maltbey,* 1 *Kelly,* 546. *Reid vs. Sullivan,* 1 *Kelly,* 294.

Courts will not so construct the Constitution as to make it an incumbrance to commerce, but they will sustain all laws not clearly *unconstitutional.* 1 *Peters' Digest, page* 559, *case* 11.

*By the Court.*—LUMPKIN, J. delivering the opinion.

The General Assembly of this State, on the 11th day of December, 1841, passed an Act " to give to all persons employed in steamboats and other water-craft on the Chattahoochee, Altamaha, and Ocmulgee rivers, a lien on said steamboats or water-craft, for his, her, or their wages, and for wood and provisions furnished, and to point out and facilitate the mode of the collection of the same. *(Pamphlet Laws of* 1841, *p.* 167.) Section 1 declares " that from, and immediately after the passage of said act, all persons employed either as captain, pilot, engineer, first or second mate, fireman, deck-hand, or in any other capacity whatever, on all steamboats and other water-craft engaged in the navigation of the Chattahoochee, Altamaha, and Ocmulgee rivers, for any debt, dues, wages, or demands, that he, she, or they may and shall have against the owner or owners of said steamboat or other water craft, for personal services, done, rendered, or performed on board the same, and for wood and provisions, an exclusive lien on said steamboat or other water-craft, against the owner or owners thereof, superior in dignity to, and of higher claim than all other incumbrances, no matter of what nature or sort the same may be, *provided* he, she, or they shall demand and present the collection of the same, as hereinafter to be provided for, at any time within twelve months after the same shalt become due and payable."

Sec. 2. " *And be it further enacted,* That whenever any captain, pilot, engineer, first or second mate, fireman, deck-hand, or

any other person employed on any steamboat, or other water-craft, navigating or running on the Chattahoochee river, shall have any claim or demand against the owner or owners of said steamboat or water-craft, for services rendered on board the same, shall be desirous of collecting the same upon the said debt becoming due, and refusal to pay the same upon demand made, he, she or they may, upon application to any Judge of the Superior Court, or Justice of the Inferior Court in any county in which said steamboat or water-craft may then lie, upon the same arriving at the landing, put, or place of destination, to which the same has been freighted, make affidavit before him of the amount due him, her or them, done and performed on board said steamboat or other water craft, and specify the name thereof; whereupon the said Judge or Justice of the Inferior Court, shall grant an order to the clerks of their respective Courts, as the case may be, requiring said clerk to enter up judgment upon said affidavit, in favor of the applicant for the amount sworn to be due; and it shall be the duty of said clerk to issue instanter an execution therefor, against the owner or owners of said steamboat or other water-craft, to be directed to the sheriff of said county, whose duty it shall be, forthwith, te levy said execution upon said steamboat or other water craft, and advertise and sell the same under the same rules and regulations as govern sheriff's sales in other cases : *Provided*, the said demand shall exceed the sum of thirty dollars. And when said sum shall be for thirty dollars or under, then, and in that case, the application shall be made to one of the Justices of the Peace in the district in which said steamboat or other water-craft may then be, as aforesaid, the same being at the landing, port, or place, to which the same was last freighted, and the said Justice of the Peace, upon filing of the said affidavit, shall issue execution thereon, instanter, for the amount sworn to be due against said steamboat or other water-craft, and the owner or owners thereof, and deliver the same to any lawful coustable of the district aforesaid, whose duty it shall be, forthwith, to levy said execution on said steamboat or other water craft, and return the same to the sheriff of the county in which the same may be, whose duty it shall be to advertise and sell, as in other cases."

Sec. 3. " *And be it further enacted*, That whenever any owner or other persons, having control of any steamboat or other water-craft, against which any proceedings may be had under the fore-

going provisions of this act, and may be desirous of contesting said claim or demand on the ground that the same, or some part thereof, is not due and owing, he, she, or they shall file his, her, or their affidavit, denying that the whole, or some part thereof, was due at the time the applicant files his affidavit, as provided for in the second section of this act; but when only a part is denied on oath, the amount admitted to be due shall be paid, before the officer levying said execution, shall deliver up the property levied on or hereinafter specified, and that after filing of the affidavit as above required in this section, and giving bond and good security, residing in the county where such proceedings may be had, to the plaintiff in double the amount claimed, conditioned for the (payment of the) eventual condemnation, money and all costs incurred thereon; and whenever said affidavit and bond shall be filed as aforesaid, the levying officer shall deliver up the property levied on, and return the affidavit and bond to the next Court in said county to which said execution may have been returnable, upon which an issue shall be made up and formed, and the truth of the same shall be tried by a jury of said county respectively, at the first term of said Court, unless good cause be shown for a continuance; but the same shall be continued only for one term by each party; and from the verdict rendered in such case, either party shall have the power or privilege to enter an appeal."

Sec. 4. "*And be it further enacted,* That all the provisions of this act shall apply to all stearmboats and water-craft navigating the Altamaha and Ocmulgee rivers, and that all persons who furnish wood and provision to said steamboats or other water-craft, shall have the same remedies as herein before provided." *Ib. p.* 8, 167, 168, 169.

In 1845, the Legislature passed the following act to extend the provisions of the Act of 1841, and to include *Flint* river therein: "*Be it enacted, &c.* That all the provisions of the above recited Act be, and the same are hereby extended to all persons employed on steamboats and other water-craft on Flint river. And whereas it frequently happens that persons employed on said steamboats and other water-crafts on said Chattahoochee, Ocmulgee, Altamaha, and Flint rivers, are negroes and free persons of color, *be it therefore further enacted,* that whenever any negro, being a slave or free person of color, shall be employed as pilot, engineer, first or second mate, fireman, deck-hand, or in any

other capacity whatever, on all steamboats and other water-crafts engaged in the navigation of said rivers, to wit, the Chattahoochee, Altamaha, Ocmulgee, and Flint rivers, that then, and in all such cases, the owner, master, agent, attorney in law, or attorney in fact, of said negro slave or free person of color, shall have the like remedies, for wages or demands which he, she, or they may or shall have against the owner or owners of said steamboats or other water-crafts, for the services of said negro slaves or free persons of color, as are given to all other persons, whose employments are recited in said Act." *Pamphlet Laws* 1845, *p.* 152.

On the 9th of July, 1847, Nelson P. Foster applied to Wm. S. Beall, junior, a Justice of the Inferior Court in and for the county of Decatur, for an order in terms of the Act of 1841, alleging on oath that the Flint River Steamboat Company was indebted to him $155 55, for his services as carpenter, rendered the said Company before that time, in and about the steamboat Magnolia, the property of the said Company, and at their special instance and request, as would more fully appear by the bill of particulars annexed to his petition.  A judgment was entered up in favor of Foster, execution issued, and was levied on said boat. The Company, by their agent, James R. Butts, filed a counter affidavit, stating that the whole amount claimed was not due ; and gave bond and security, as required by the Statute.

In the Court below, counsel for the Company insisted, among other things, that the Acts of 1841 and 1845 were repugnant both to the Constitution of the United States, and of the State of Georgia; and by agreement between the parties, this is the only point submitted for the consideration of this Court.

[1.] It has been urged in the argument, that the Statutes under discussion are null and void, being against the plain and obvious principles of common right and common reason.   We do not perceive anything in these Acts in derogation of common right. Their provisions are not confined to any particular individual or set of men, *by name*, separate and apart from the rest of the community.   *All* may entitle themselves to the benefit of the remedy which they prescribe, by being employed in the navigation of the water courses therein designated.   No one is excluded from this privilege.   There are many of our statutes, as that for instance, which authorizes money, or other valuable effects lost at

gaming, to be recovered back, which are confined in their operation, to a much smaller number of persons than those embraced by the Acts in question, and which can be pursued only by persons who have that particular class of rights to enforce, yet which have never been esteemed as conferring exclusive privileges.

[2.] Let us examine for a moment the other branch of the proposition, which affirms that Statutes passed against the plain and obvious principles of common reason, are absolutely invalid. Such, I am aware, was the language of the Court in *Starn vs. McLaws & Wife*, 1 *Bay*, 98. And in *Morrison vs. Barksdale*, 1 *Harper's L. R.* 102, the Court adopting the identical words of Judge Blackstone, (1 *Com.* 91,) lay it down as one of the received rules in the construction of Statutes, that " if absurd consequences, or those manifestly against common reason, arise collaterally out of a Statute, it is void, *pro tanto.*" And this doctrine is to be found scattered through the authorities, from Lord Chief Justice Hobart's day down to the present period. He held that an Act of Parliament made against natural justice, or to make a man a judge in his own cause, was void in itself; for, says he, *jura naturæ, sunt immutabilia*, and they are *leges legum.* *Hob.* 87.

I cannot subscrsbe to this doctrine, especially in its application in this country, where the powers and province of each department of the government are so accurately defined   And adopting the language of Mr. Christian, " with deference to these high authorities, I should conceive that in no case whatever, can a Judge oppose his own opinion and authority to the clear will and declaration of the Legislature," so long as it acts within the pale of its constitutional competency. The province of the Court is to interpret and *obey* the mandates of the supreme power of the State, however absurd and unreasonable they may appear. And such would seem to be the opinion of Judge Blackstone himself. For, on the same page which has just been cited, he maintains that the *Legislature* is in truth the *sovereign power*; that its *authority is absolute, " acknowledging no superior on earth."*

This, however, is not an open question, under the agreement upon which this case is brought up. I shall proceed, therefore, to notice briefly, another point which has been mooted before us.

[3.] It is contended that the defendant must have notice, actual or constructive; otherwise no valid judgment could be render-

Flint River Steamboat Company *vs.* Foster.

ed against him. We are not inclined to controvert this general rule. On the contrary, we believe it to be well established by the authorities. 4 *Peters*, 174. 6 *Yerg.* 522. 1 *Howard*, 444. 5 *Wend.* 155. 2 *Dev. Eq. R.* 235. 3 *J. J. Marsh*, 105. This doctrine is somewhat quaintly though strikingly illustrated in *The King* against *Chancellor, Masters, and Scholars of the University of Cambridge*, 1 *Strange*, 557, where Fortescue, J. says, "the objection for want of notice can never be got over. The laws of God and man both give the party an opportunity to make his defence, if he has any. I remember to have heard it observed by a very learned man upon such an occasion, that even God himself did not pass sentence upon *Adam* before he was called on to make his defence. *Adam*, where art thou? Hast thou not eaten of the tree whereof I commanded thee that thou shouldest not eat? And the same question was put also to Eve."

There are several suggestions to make, however, as it regards this principle. 1st. That it only obtains in the absence of *positive law*. The Legislature may unquestionably authorize a judgment to be rendered against a party without notice. If the expressions used in the Statute will admit of a doubt, it will not then be presumed, that a construction dispensing with notice can be agreeable to the intention of the Legislature, the consequences of which are so unreasonable. But where the signification is manifest, there is no power of dispensation in the Courts. And such seems to have been the opinion of Chief Justice Marshall, in *Mode vs. The Deputy Marshal of Virginia*, 1 *Brock. R.* 334. "It is a principle of natural justice," he observes, "which Courts are never at liberty to dispense with, *unless under the mandate of positive law*, that no person shall be condemned unheard, or without an opportunity of being heard."

*Barton vs. Nelson*, 3 *Johns.* 474, was a case precisely similar to the present. Neilson was an overseer of the highways in and for District No. 6, in Stillwater in the county of Saratoga, and according to the direction of the Act "to regulate highways," passed 8th April, 1801, *(Laws of N. Y. v.* 1, *p.* 588,) made a complaint in writing to the Justice, that Benton had neglected to work on the highways, &c. on the 16th October, 1806, according to the warning for that purpose, given to him by Neilson; upon which the magistrate, without notice or trial, issued a warrant against Benton, to levy and collect of him $1, the penalty given by the Act,

and 25 cents for the warrant.   Benton *certioraried* the proceeding, and his counsel argued before the Supreme Court, that his client was convicted without being heard, or even cited to show cause why a warrant should not issue ; that this was contrary to every principle of reason and natural justice ; that it was indispensable that the party accused should be *summoned* to appear before he is condemned. (Citing 4 *Black. Comm.* 286.    1 *Salk.* 181.    2 *L. Raymond*, 1405.    *Strange*, 630.    8 *T. R.* 270.    7 *Ib.* 370.    3 *Burn's Justice*, 28.)    That the Justice in this case was not a mere *ministerial* officer, but a *Judge,* and that the overseer should not only state his complaint in writing, but furnish the necessary evidence to support it.    *Thompson,* J. delivered the opinion of the Court.    He said : " Had the magistrate any thing to try, or any discretion to exercise, I should think it indispensably requisite that the party should be *notified.*    But I cannot discover, from the provisions in this section of the Act, that the magistrate has any discretion.    If he have none, *notice* would be superfluous.    No authority is given to the magistrate to enter into an examination with respect to the sufficiency of the excuse for neglecting to work.    Whether this power has been discreetly vested in the overseer, it is not for the Court to say.    The issuing of the warrant is matter of course upon the complaint made, without any further investigation.    No notice is therefore required, because it would be useless.    The conviction must accordingly be affirmed."

By reference to the Act of 1841, it will be discovered that no discretion is given to the Judge of the Superior, or Justice of the Inferior Court, or Justice of the peace.    But upon application being made in terms of the law, the order issues as matter of course, for an execution.    And the excuse for this will be found in the *second remark* which we have to submit in regard to *notice.*

*Notice* may be actually served, or constitutionally given, by allowing the party to pursue such means as the law regards as equivalent to personal service, beforehand, for the protection or defence of his rights.    Notice beforehand, is not essentially necessary, where the Statute itself provides specific means of relief.    8 *Vermont,* 373.    Now, under the Act of 1841, there must be a *demand* and *refusal* to pay, upon the debt becoming due ; and the execution, when issued and levied, must be advertised under the same rules and regulations as governed Sheriff's sales in other cases; and then an opportunity is given to the defendant to con-

test the claim or demand of the real or pretended creditor, if he see fit to do so. He is not precluded by the proceeding, as in case of judgment upon notice. And this is analagous to other provisions of the law. No other notice is given of the foreclosure of mortgages on personal property, than the levy and advertisement of sale. And there, as here, provision is made under this constructive notice, to dispute the claim which is sought to be enforced. So much for the matter of notice, which, like the point previously discussed and disposed of, is not, under the agreement, strictly before us.

Has trial by jury, and the right thereto, as secured to this company, and all other citizens, by the constitution of the United States, and of the State of Georgia, been violated by these Statutes? This question is one of the deepest interest; and if the complaint against these acts be well founded, the plaintiff in error is unquestionably entitled to the protection of this Court.

I will not stop, at this late day, to inquire whether the Courts have the power, and if so, if it be not their duty to declare Acts of the Legislature, repugnant to the Constitution, void? These grave questions once elicited much discussion. And Gibson, J. (since promoted to the head of the Judiciary in Pennsylvania,) so late as 1825, in *Eaker and others vs. Raub and others*, 12 *S. & R.* 345, so far from admitting that it was the right and duty of the Judiciary to pronounce Acts of the Assembly void, which were a manifest breach of the Constitution, treated it as a professional dogma, received rather as a matter of faith than of reason.

Courts are organized and established to administer the laws of the land. In their decisions, they are bound to observe and protect those *paramount* laws which they are sworn to *support*.

[5.] The laws of Georgia may be thus graduated, with reference to their obligation or authority. 1st, The Constitution of the United States. 2d, Treaties entered into by the Federal Government before, or since, the adoption of the Constitution. 3d, Laws of the United States, made in pursuance of the Constitution. 4th, The Constitution of the State. 5th, The Statutes of the State. 6th, Provincial Acts that were in force, and binding on the 14th day of May, 1776, so far as they are not contrary to the Constitution, laws and form of government of the State. 7th, The Common Law of England, and such of the Statute Laws as were usually in force before the revolution, with the foregoing limitation.

Flint River Steamboat Company *vs.* Foster.

It is the peculiar province of the Courts to ascertain and declare when any two of these several species of law conflict with each other; and then it follows, as a matter of course, that the *less* must yield to the *greater*.

And on this point there is no dearth of precedents. 2 *Dall.* 240. 1 *Tuck. Black. app.* 5. 3 *Dall.* 171. 12 *Wheat.* 270. 6 *Cranch*, 128. 1 *Cranch*, 137, 173. *Walker*, 146. 2 *Porter*, 203. 2 *Litt.* 90. 9 *Yerg.* 490. 3 *Desaus.* 476. 1 *Hayw.* 28. 6 *Rand.* 245. 5 *Binn.* 355. 19 *Johns.* 58. 1 *Harr. & John.* 236. 10 *Conn.* 522. 3 *Ver.* 507. 3 *N. H.* 473. 6 *Green.* 112, 412. 15 *Mass.* 447.

The *right*, then, being established, we ask, does the Act of 1841, as amended and enlarged by the Act of 1845, contravene the Constitution of the United States, or the Constitution of the State of Georgia?

The 7th amendment of the Constitution of the United States, is in these words: "In suits at Common Law, where the value in controversy shall exceed 20 dollars, the right of the trial by jury, shall be preserved; and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the Common Law."

The 5th section of the 4th article of the Constitution of Georgia declares, that "Freedom of the press, and trial by jury, as heretofore used, shall remain inviolate."

[6.] It would be out of place, on this occasion, to expatiate on the importance of trial by jury. In England, it has long been esteemed the great bulwark and safeguard, both of civil rights and of political freedom. It is incorporated prominently into *Magna Charta*. Our ancestors, when they removed to this country, brought this admirable system with them, as their *birth right* and inheritance. And for greater security, have had a guarantee for its preservation inserted, not only in the Federal, but in all their State Constitutions. So sensible were they of its value, that when this right was abridged by the British Parliament, the Congress of 1774 declared, (see the 5th of their resolutions,) "that the respective colonies are entitled to the Common Law of England, and more especially to the great and inestimable principle of being tried by their *peers* of the vicinity, according to the course of that law."

And we concur cordially in the glowing eulogium pronounced upon trial by jury, in a recent number of the Law Reporter. We

hold, with the talented Editor of that periodical, that it is one of the great elements, the greatest characteristic of free government. That it is the school in which the republican learns to weigh facts, to balance arguments; and where he gets that habit of delibera- tion, without which the right to vote might prove an injury to himself, and an injury to his fellows. That it is, in fact, the school where the man is educated into the citizen. That this is the true popular element of the judiciary. That by making every citizen a member of the Court, it saves the administrators of justice from that isolation from the people, which is the first step toward se- cret proceedings and arbitrary tribunals, like those which conti- nental Europe is fast exchanging for public trial by jury. The best omen and pledge of her regeneration!

And while it is undoubtedly true, that the provisions, both of the National and State Constitutions, respecting this institution, apply to *civil cases*, still it cannot be denied, that they were mainly and primarily intended to protect inviolate, the trial by jury, in *criminal prosecutions*. And Courts will watch with more jealousy, any departure from, or trespass upon trial by jury in the *latter* class of cases, than the *former*.

In *criminal* proceedings, trial by jury cannot be too highly ap- preciated or guarded with too much vigilance. So long as this palladium and *Habeas Corpus*, remain unimpaired, life and liber- ty are safe from passion, prejudice, or oppression, no matter from what quarter they emanate. What security to innocence and what a humane arrangement of the law, that punishment can on- ly be inflicted by the unanimous decision of twelve of our honest and impartial neighbors! What are slight inconveniences in the mode of selecting a jury, compared with this blessed protection! Long may trial by jury, in criminal cases, the main pillar in the temple of justice, be continued to the country, and its results be characterized by wisdom and candor, patience and purity, firm- ness and independence.

We may, however, after all, *doubt* the *essentiality* of trial by ju- ry in *civil cases*. In Courts of Ordinary and Admiralty, and in Chancery, except in extraordinary cases, to inform the conscience of the Court, juries do not intervene. Mortgages are foreclosed, copies of lost papers established, lands partioned, dower as- signed and judgments rendered on bail bonds, forthcoming bonds, jail bound bonds, and honest debtor's bonds, &c. and numerous

other matters adjudicated daily in our Courts, without a jury. Under our various Railroad Charters, juries are only resorted to in the second instance, to assess the damages to be paid for the right of way; and yet, the constitutionality of these acts, here and elsewhere, is too well settled to be called in question. Indeed, it is notorious, that modern law reform, both in England, and in this country, seeks, amongst other objects, to dispense, as much as possible with juries. A jury is never to be invoked, unless specially demanded by one of the parties. In New York, under their new code, this regulation, I believe, applies to all civil actions, and as a justification for this change, it is stated that in the city of New York, where the right of election existed as to the mode of trial, 1285 judgments were rendered by the Court in Marine causes *without*, against 67 upon the verdict of a jury. And that under the late Act of Parliament organizing county Courts in England, juries were demanded in three cases only, out of three thousand. Jeremy Bentham, who, with all his eccentricities, is undoubtedly the Father of modern law reform, peremptorily rejected all but what he was pleased to term *single* seated justice, and would allow no merit whatever to any tribunal composed of more, either for weighing conflicting evidence, assessing the amount of compensation, or reviewing the judgments of Inferior Courts.

I deem it unnecessary to pursue this strain of remark further, and will only add, that to say the least of the experiment now making, it is a vast saving of time, trouble, and expense, to suitors and the country. Whether these considerations should outweigh the advantages resulting from a personal participation, by every citizen, in the practical administration of public justice, it does not become me to say.

In the case under review, it is not pretended that trial by jury is taken away expressly, or by implication. On the contrary, two jury trials are allowed, wherever there is any controversy as to the indebtedness. The Act of 1841 directs that the issue shall be made up and formed, and the truth thereof tried by a jury at the first term of the Court, to which the case is made returnable, and from the verdict thus rendered, either party has the power, or privilege to enter an appeal.

[7.] The provision in our State Constitution, that trial by jury, as heretofore used, shall remain inviolate, means that it shall not

be taken away, as it existed in 1798, when that instrument was adopted, *and not that there must be a jury in all cases.* New forums may be erected, and new remedies provided, accommodated to the ever shifting state of society.

[8.] Besides, trial by jury is a privilege which may be waived. For an act to be unconstitutional, it must prohibit, or take away this trial in a case where it was heretofore used.

[9.] An act which merely authorizes a judgment to be rendered, without the intervention of a jury, is not on that account unconstitutional; more especially, where it guarantees this right ultimately, as in this case. If the party, therefore, does not demand an issue and trial by jury, what right has he to complain? *Rand.* 1. 1 *Washington Va. R.* 356.

[10.] It is insisted that the right is so clogged by restrictions, as to amount to a denial. The owner of the steamboat, or other water-craft, is required to pay up so much of the claim as he admits to be due, if any, and to give bond and good security, residing in the county where the proceedings are had, to the plaintiff, in double the amount claimed, conditioned for the payment of the eventual condemnation money, and all costs incurred thereon, before he can litigate the matter.

We cannot think the trial by jury, substantially defeated by these conditions, though the defendant may, and at times probably will, be subjected to some inconvenience, in complying. These terms may be onerous, but this is purely a question of expediency, and one which must, from its very nature, address itself exclusively to the law maker. And it is difficult to prescribe limits to the power of the Legislature, in this respect. Cases might arise which would authorize that body to go very far in disregarding the rules and regulations which are ordinarily observed in the enactment of a law for the assertion and defence of rights. There is no invasion or infringement of the Constitution, so long as trial by jury is not directly nor indirectly, abolished. I repeat, it is impossible to say at what point the Legislature ought to stop; and if undertaken to be said by the Courts, it must be at some point of great excess, that such a stand can be made.

Before a party is permitted to appeal in this State, he must, if able, pay all costs which have accrued, and give bond and security for the eventual condemnation money. It might be well enough, so to amend the Act of 1841, as to extend the benefit of

its provisions, to defendants, who would make affidavit that they were unable, from poverty, to comply with its terms.

That the defendant should be compelled to pay up what he admits to be due, before he can proceed, is no greater hardship than is imposed by the rules of practice on defendants in execution, who are required to pay up the amount admitted to be due,' or the sheriff is authorized to raise that amount, and accept the oath of illegality for the residue. In analogy to this regulation, the Act of 1841 might be farther amended, by allowing the execution to proceed to collect the sum admitted to be due, without exacting its actual payment.

It must be a very clear and palpable case, which would warrant the Judiciary to exercise this delicate duty of declaring a law unconstitutional, and one, too, which has been passed with so much deliberation. The Act of 1841 came under solemn revision in 1845, and so far from being abrogated, or in any manner modified, its privileges were extended. Here, then, we have the joint act of both the other co-ordinate departments of the government, twice ratified. We should pause long under such circumstances, before giving our consent to pronounce such a law invalid, for the mere reason, that in our opinion the discretion of the Executive and Legislature had been incautiously exercised.

In conclusion, I beg leave to adduce a few leading cases in support of the views by which we have been guided.

In Kentucky, a Statute authorizing judgment to be entered, on motion, for breach of an agreement thereafter to be made to pay money for the building of a penitentiary, is not unconstitutional. It is not unconstitutional to render judgment in such case, without a jury, if the defendant do not appear. *Ewing vs. Directors, &c. Hardin*, 5. So the Statute authorizing a judgment against the sureties of a sheriff without a jury, is constitutional. *Murray vs. Askew*, 6 *J. J. Marsh*. 27. So the Statute which gives a summary redmedy against sheriffs, who fail to pay over money. *Wells vs. Caldwell*, 1 *Marsh*. 441. Statutes which authorize a Justice of the Peace to decide questions without a jury, but gives an appeal from his judgment, to a Court which tries by jury, are not unconstitutional. 1 *Hawks*, 482. 8 *Yerg*. 444. 4 *Conn*. 535. 4 *Bibb*, 416. *Head vs. Hughs*, 1 *Marsh*. 372. 1 *Bibb*, 342.

In *Keddie vs. Moore*, 2 *Murphey's Law and Eq*. 41, the Act

of the Assembly increasing the jurisdiction of a Justice of the Peace to £30, was resisted, as inconsistent and incompatible with the Constitution of the State. *Jocelyn* contended that the jurisdiction of magistrates would be extended until the rights of trial by jury would be frittered away entirely; that it was a direct interference with their bill of rights, declaring " that in all controversies at law, respecting property; the ancient mode of trial by jury, is one of the best securities of the rights of the people, and ought to remain sacred." It was argued, he said, that trial by jury was not taken away by this increase of jurisdiction; that the party dissatisfied with the judgment of the Justice, may appeal to a Court, where he can have his cause tried by a jury. It is true, he said, that the right of jury trial is given by the Act, *but it was so clogged with difficulties, that few can enjoy it, and as the law now stands, it often deprives the poor, who cannot give the security required, of the right of trial by jury.*

*Locke*, Judge, delivered the opinion of the Court—" when the convention declared that the ancient mode of trial by jury should be preserved, no restriction was thereby laid on the Legislature as to erecting or organizing judicial tribunals, in such manner as might be most conducive to the public convenience and interest. It is true that the Legislature cannot impose any provisions substantially restrictive of the trial by jury; they may give existence to new forms; they may modify the powers and jurisdiction of former Courts, still, the sacred rights of any citizen, to trial by jury, must be preserved. Here the right is given of appealing to a Court, where the defendant will have the benefit of trial by jury. It cannot, therefore, be said, that the right is taken away. So long as it is preserved through an appeal, the preliminary mode of obtaining it, may be varied at the will and pleasure of the Legislature. The party wishing to appeal, may be subjected to some inconvenience in getting security. *But this inconvenience does not in this, nor any other case, where security is required, amount to a denial of right.*"

In *Vangart vs. Waddel*, 2 *Yerg.* 260, constitutional objection was taken to the Act of 1321, for giving new and additional remedies to the creditors of the Tennessee Fayetteville Bank, and the Farmers and Mechanics' Bank, to enforce the payment of their debts. But the Court, in delivering its opinion, says, " To admit the principle, that such a law cannot be passed by the Legisla-

ture, would be at once to strike at the root of all their Statutes, providing summary remedies against sheriffs, coroners and constables; also against those providing a remedy for securities, who have paid the debt of their principal. Who ever pretended that the Acts increasing the jurisdiction of Justices of the Peace, from twenty to fifty and afterwards to one hundred dollars, were unconstitutional? It has been urged, and with some plausibility, that the Act is unconstitutional, because it gives the plaintiff a summary remedy, and that too, without an intervening jury trial, or at any rate, that the party could not have it *without giving security for the debt, &c.* whereas, the law as it stood before, gave him a jury trial, on appearance bail only. The answer to this objection is, that the right of trial by jury is not taken away. It does not follow that the ancient right of trial by jury is taken away, because the pleadings and issues are not submitted in Common Law form. The Act of the Assembly, then, does not violate the Constitution. It does not give to the Court an arbitrary power to seize the estate of the Bank or of the debtor to the Bank, and dispose of it without giving the parties a day in Court, and the means of contesting before a jury, all such facts as may be necessary to the attainment of justice."

In *Biddle vs. The Commonwealth*, 13 *S. & R.* 410, Chief Justice Tilghman says, "But it is said that the Constitution of the State was infringed by impairing the trial by jury. The action was brought before a magistrate, who decided without a jury. But then, the defendant had the right to appeal to the Court of Common Pleas, where he might have a trial by jury. There is no weight in the objection, that the appeal is clogged with the condition of the appellant's making oath, that he verily believed that injustice had been done him, and that the appeal was not made for the purpose of delay. Laws, such as these, promote justice and have the substance of the trial by jury unimpaired, and that is all that is required by these expressions in the Constitution, " that *trial by jury shall be as heretofore.*"

*Thompson and Biddle*, for plaintiff in error, in *McDonald vs. Schell*, 4 *S. & R.* 240, contended that to deny an appeal under the arbitration Act of Pennsylvania, passed 20th March, 1810, until the payment of costs, which frequently amounted to enormous sums, and to embarrass it with conditions, *with which a poor man could not comply*, were effectually to deprive him of a trial

by jury, and therefore, a direct violation of the Constitution of the State. The Court *declined* hearing *Todd* in reply, suggesting that the press of business made it a duty not to hear counsel in whose favor they had formed an opinion, and decided that an appeal could not be entered without payment of costs. " The law may, undoubtedly, in certain cases *bear so hard on a poor man as almost to deprive him of his appeal, but that will not justify the Court in deciding that the law is void. All general laws operate with severity in particular instances.*"

I would remark that the law always properly manifests its tenderness for the impotent. Hence the saving in the Statute of Limitations, and numerous other statutes in favor of infants, feme coverts, &c. It is not unreasonable, therefore, that the Legislature should have provided a summary remedy for the benefit of those who navigate our water-courses, especially upon those rivers where it is notoriously true that the owners of steamboats and other water-craft usually reside aboard, and from that and other causes are not accessible by the ordinary process of law. Their agents, however, as this record discloses, are generally present, and can defend for them.

These doctrines, like most others coming before that tribunal, were thoroughly discussed and ably decided by the High Court of Errors and, Appeals in the State of Mississippi, in *Lewis, et al. vs. Garrett's Adm'rs*, 5 Howard, 434. Upon the re-argument, Judge Trotter, delivering the opinion, said, "the Constitution in guaranteeing to the citizens of this State the right of trial by jury, did not intend to disturb the ancient and well established jurisdiction of the several Courts of the country; nor to change entirely the modes of trial, as they are regulated by the Common Law. For if that interpretation were given to it, no order of the Probate Court could be sustained, and the decrees of the Court of Chancery, would be mere waste paper. It was designed simply to guard the people against the arbitrary or capricious interference of the government, and was conceived and adopted in the spirit of the great charter of English liberty, which provides that no man shall be deprived of his life, liberty, or property, except by the judgment of his peers, or the law of the land. Under this charter the people of England have long flourished in the enjoyment of a boasted freedom from any responsibility but to the declared and established laws of the land. To the rule of conduct

which these laws prescribe, they submit themselves and their property, and are bound by their judgments, in whatever mode they may be pronounced ; and it is not regarded as any infringement of their rights thus solemnly pledged, that in the arrangement and distribution of the powers of the several Courts, which have grown up under the Common Law in that country, *modes of trial in many cases are allowed, which dispense with the verdict of a jury.* For whether the Court pronounces the judgment of the law upon facts found by the jury, in cases where a trial by jury is required, *or upon facts ascertained in other modes, when they are permitted, the judgment is still the award of the law ;* and the inconvenience to which it may subject the party, is the result of the judgment of his peers in the one case, *and of the law of the land in the other.* And it is in this sense that the Constitutions of this country have provided that no person shall be deprived of life, liberty, or property without due process of law."

And this reasoning is fully sustained by the Supreme Court of the United States in the case of the *Bank of Columbia vs. Oakley,* 4 *Wheaton,* 235. The 14th section of the Act of Assembly of Maryland, of 1793, c. 30, incorporating the Bank of Columbia, is in these words : " And whereas it is absolutely necessary, that debts due to the said bank should be punctually paid, to enable the directors to calculate with certainty and precision on meeting the demands that may be made upon them : *Be it enacted,* That whenever any person or persons are indebted to the said bank, for moneys borrowed by them, or for bonds, bills, or notes given or indorsed by them, with an express consent in writing, that they may be made negotiable at the said bank, and refuse or neglect to make payment at the time the same may become due, the president shall cause a demand in writing on the person of the said delinquent or delinquents, having consented as aforesaid; or if not to be found, have the same left at his last place of abode; and if the money so due shall not be paid within ten days after such demand made, or notice left at his last place of abode as aforesaid, it shall and may be lawful for the president, at his election, to write to the clerk of the General Court, or of the county in which the said delinquent or delinquents may reside, or did at the time he or they contracted the debt, reside, and send to the said clerk the bond, bill, or note due, with proof of the demand made as aforesaid, and order the said Clerk to issue *capias ad*

*satisfaciendum, fieri facias,* or attachment by way of execution, on which the debt and costs may be levied, by selling the property of the *defendant,* on the sum or sums of money mentioned in the said bond, bill, or note ; and the clerk of the general Court, and the clerks of the several county Courts, are hereby respectfully required to issue such execution or executions, which shall be made returnable to the Court, whose clerk shall issue the same, which shall first sit after the issuing thereof, and shall be as valid and effectual in law, to all intents and purposes, *as if the* same had issued on judgments regularly obtained in the ordinary course of proceeding in said Court; and such execution or executions shall not be liable to be stayed or delayed by any supersedeas, writ of error, appeal, or injunction from the Chancellor : *Provided,* always, that before any execution shall issue as aforesaid, the president of the bank shall make an oath, (or affirmation, if he shall be of such religious society as allowed by this State to make affirmation,) ascertaining whether the whole or what part of the debt due to the bank on the said bond, bill, or note is due ; which oath or affirmation shall be filed in the office of the clerk of the Court, from which the execution shall issue ; and if the defendant shall dispute the whole or any part of the said debt on the return of the execution, the Court before whom it is returned, shall and may order an issue joined, on a trial had in the same Court at which the return is made, and shall make such other proceedings that justice may be done in the speediest manner."

An execution was issued under this Act by the clerk, not upon any judgment, but upon the simple deposite of a note, which was payable and negotiable at the Bank, and which not being paid at maturity, the money due upon it was demanded of the debtor, and not being paid within the ten days afterwards as required by the Charter, was sent to the Clerk with instructions to issue the execution. This proceeding, as will be seen, was in pursuance of the Act incorporating the Bank. The defendant moved in the Court below to *quash* the execution, upon the ground that it was contrary to the Constitution of the United States, article 7th, of amendments, (which I have already quoted,) and to the 21st article of the bill of rights of Maryland, which declares, " That no freeman ought to be taken, or imprisoned, or disseized of his freehold, liberties, or privileges, or outlawed, or

exiled, or in a manner destroyed or deprived of his life, liberty, or property, but by the judgment of his peers, or by the law of the land."

Mr. Martin, in support of this proceeding, was stopped by Mr. Justice JOHNSON, who thus delivered the opinion of the Court : " Was the act authorizing the issuing of an execution *against the body* or effects of the debtor, *without the judgment of a Court*, upon the oath and demand of the President of the Bank, a violation of the rights intended to be secured to the individual under the Constitution of the United States, and of the State of Maryland ? To constitute particular tribunals for the adjustment of controversies, to submit ourselves to the exercise of summary remedies, or to temporary privation of rights of the deepest interest, are among the common incidents of life. Such are submissions to arbitration, and such are stipulation bonds, forthcoming bonds, and contracts of service. By making the note negotiable at the Bank of Columbia, the debtor chose his own jurisdiction. In consideration of the credit given him, he voluntarily relinquished his claims to the ordinary administration of justice, and placed himself only in the situation of an hypothecator of goods, with power to sell on default, or a stipulator in the admiralty, whose voluntary submission to the jurisdiction of that Court, subjects him to personal coercion. It is true cases may be supposed, in which the policy of a country may set bounds to the relinquishment of private rights, and this Court would ponder long before it would sustain this action, if we could be persuaded that the act in question, produced a total prostration of the trial by jury, or even involved the defendant in circumstances which rendered that right unavailing for his protection. But a power is reserved to the Judges to make such rules and orders, " as that justice may be done," and as the possession of judicial power imposes the obligation to exercise it, we flatter ourselves that in practice, *the evils so eloquently dilated on by counsel, do not exist.* And that if the defendant does not avail himself of the rights given him of having an issue made up, and the trial by jury which is tendered to him by the Act, it is presumable that he cannot dispute the justice of the claim.

[11.] As to the words from *Magna Charta* incorporated into the Constitution of Maryland, after volumes written and spoken with a view to their exposition, the good sense of mankind has

at length settled down to this : *that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights, and distributive justice.* With this explanation, there is nothing left to this individual to complain of. What he has lost, he has voluntarily relinquished ; *and the trial by jury is open to him, either to arrest the progress of the law in the first instance, or to obtain redress for oppression, if the power of the Bank has been abused.* The forms of administering justice, and the duties and powers of Courts as incident to the exercise of a branch of sovereign power, *must ever be subject to legislative will."*

It will be noticed that the consent of the party was not that summary process of execution before judgment should be issued against him, which is certainly rather an inversion of the natural order of judicial proceedings ; it was simply that his paper should be negotiated at this particular Bank. So here it may be said, that every agreement made respecting service in the navigation of the particular streams named in the acts, is a voluntary submission by the owners of the steamboats or other water craft to the law of the contract, and acquiescence in the remedy which it gives. And I must be excused for saying, that but for " *the evils so eloquently dilated on* " by the able advocates of the plaintiffs in error, and which we are fully persuaded do not in fact exist, this case would have appeared to the mind of this Court, wholly free from doubt.

This Maryland Act came under the review of the general Court and Court of Appeals of that State, *in the Bank of Columbia vs. D. Ross, 4 Harr. & McHen.* 455 ; when Chase, Chief Justice, made the following observations upon a similar motion to *quash* an execution. " It is a well established rule in expounding Acts of the Legislature, that the intention of the makers must prevail; which intention is to be collected from the words they have used. It appears by the preamble, that in the opinion of the General Assembly, the agricultural and commercial interests of the State would be promoted, by establishing a bank in the District of Columbia ; and they have declared, that to support the said bank, it was absolutely necessary that debts due to the bank, should be punctually paid ; to effect which, they have authorized a summary, facile and expeditious mode of recovery, without infringing on the right to a trial by jury, where the

debtor controverts the claim made by the President of the Bank. The establishment of a Bank in the District of Columbia, being in the opinion of the Assembly an institution of public utility, the punctual payment of the debts due to it, being necessary to support it, and the right to a trial by jury not being infringed, there is nothing in the way to restrict the Court from giving an exposition to the Act, corresponding with, and effectuating the intention of the makers of it." The Court overruled the motion to *quash* the execution.

[12.] We submit, whether the interests both of agriculture and commerce, do not justify and require the present proceeding to be supported? We maintain that they do. Without some such provision, our internal streams, the great arteries of trade and transportation, would be abandoned. On the whole then, we are of opinion, that the Acts of the Assembly did not violate the Constitution, either of the State or of the United States; and therefore the judgment should be affirmed.

Judgment affirmed.